TIMOTHY BARRETT, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; SUSAN GIBB, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Barrett v. Commissioner
Docket Nos. 11083-82; 11543-82
United States Tax Court
T.C. Memo 1989-243; 1989 Tax Ct. Memo LEXIS 243; 57 T.C.M. (CCH) 458; T.C.M. (RIA) 89243; May 16, 1989. Robert J. Alter and Richard J. Sapinksi, for petitioner Timothy Barrett. Andrew P. Fradkin, Bruce Goldman, and G. Michael Saran for petitioner Susan Gibb. James E. Hardaker and Richard F. Flaherty, for the respondent. WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined deficiencies in the joint Federal income tax for Timothy Barrett and his former wife, Susan Barrett (a/k/a Susan Gibb), for 1975 and 1976 in the amounts of $ 11,140 and $ 14,359, respectively, and additions to tax for fraud under section 6653(b) [1] for those years in the amounts of $ 7,163 and $ 7,180, respectively. By amendment to his answer, respondent asserted the following increases in the deficiencies and additions to tax: Deficiency
Sec. 6653(b) Addition To Tax
1975
$   740
$   370
1976
4,317
2,158
*247 In response to the notice of deficiency, separate petitions were filed in 1982 by Timothy Barrett ("petitioner") and by Susan Gibb, the former Susan Gibb Barrett who now goes by the name of Susan Gibb Sherrard ("Ms. Gibb"). The two cases were consolidated by the Court. Prior to trial, Ms. Gibb and respondent entered into a stipulation of settled issues in regard to her case, docket number 11543-82. That stipulation provided, inter alia, that (1) Ms. Gibb's deficiencies for 1975 and 1976 shall be the same as the deficiencies determined by the Court against petitioner, even if the Court additionally finds that petitioner is an innocent spouse under section 6013(e); (2) Ms. Gibb is liable for the addition to tax under section 6653(b) for 1975 and 1976, and that she waives any defense as to the statute of limitations; (3) Ms. Gibb is not an innocent spouse for purposes of either section 6013(e) or section 6653(b); (4) Ms. Gibb waives the restriction contained in section 6213(a) against assessment and collection of redetermined deficiencies during the 90-day period before our decision becomes final (see sections 6215, 7481(a)(1), and 7483); and (5) Ms. Gibb would testify in petitioner's *248 case if requested. The issues remaining for decision are (1) whether the statute of limitations bars assessment and collection of any deficiencies for the years in issue; (2) if not, the amount of the deficiencies for the years in issue and whether petitioner is an innocent spouse so as to relieve him from liability for those deficiencies; and (3) whether petitioner is liable for the additions to tax for fraud for the years in issue. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioner resided in Millington, New Jersey, when he filed his petition, and Ms. Gibb resided in Hackensack, New Jersey, when she filed her petition. Petitioner and Ms. Gibb filed joint Federal income tax returns for the years in issue. Petitioner is a college graduate, having received a degree in business administration from Lambuth College in Jackson, Tennessee. Ms. Gibb has had three years of college, focusing her studies on psychology. Petitioner and Ms. Gibb met when she was 21 years old and while they both were employed by National Roofing, Inc. ("National Roofing"), a New Jersey corporation owned 50 percent by Emmett Barrett, petitioner's father, and 50 percent *249 by Leo Kessler, an individual unrelated to petitioner or Ms. Gibb. Ms. Gibb first came to National Roofing in 1971 as a temporary secretary from an agency, and was taking college courses at night while working during the day. Ms. Gibb later became a permanent National Roofing employee who performed bookkeeping duties. In 1972, All-Weather Crete, Inc. ("AWC") was incorporated, and petitioner and Ms. Gibb left the employ of National Roofing to become employees of AWC. AWC is a corporation engaged in the marketing, sale and installation of roofing insulation and allied products. During all relevant years, AWC's shares were owned as follows: Petitioner
30 percent
Emmett Barrett (petitioner's father)
40 percent
Leo Kessler
25 percent
Ranndy Barrett (petitioner's brother)
5 percent
In August 1973 petitioner married Ms. Gibb. After their marriage, petitioner and Ms. Gibb ("the Barretts") rented an apartment in Chatham, New Jersey, until March 1976, when they purchased a house in Glen Gardner, New Jersey. Ms. Gibb came from Florida, and was from a family which was "very well-to-do" financially. During the marriage, her family gave her various gifts, such *250 as a mink coat and at least one diamond ring, and also made loans to her and petitioner. In May 1974, Polylight Roof Decks, Inc. ("PRD") was incorporated. PRD's business is similar to AWC's, except that PRD sells and installs Zonolite, a type of roofing insulation sold by W. R. Grace & Co. Zonolite is a relatively inexpensive roofing insulation material, whereas All-Weather Crete (AWC's product) is an expensive roofing insulation material. One condition of W. R. Grace's grant of the Zonolite franchise was that Zonolite could not be sold under AWC's corporate name, so PRD was formed to sell Zonolite. During all relevant years, PRD's stock was owned 50 percent by petitioner and 50 percent by petitioner's father, Emmett Barrett. PRD's initial capitalization was $ 30,000, $ 15,000 from each petitioner and his father. Petitioner had received the money for his share of the contribution to PRD's capital by way of a $ 15,000 loan from Ms. Gibb's grandmother. Petitioner and Ms. Gibb repaid the loan, paying the final installment in December 1975. When AWC and PRD began doing business, they shared office facilities with National Roofing. AWC and PRD later moved their offices to *251 another building, a remodeled house three doors down the street from the National Roofing offices. During the years in issue, petitioner was the president of both AWC and PRD, and he was responsible for the entire operations portion of both businesses. During the years in issue, Ms. Gibb's responsibilities for AWC and PRD consisted of bookkeeping, payroll, cash receipts and disbursements, and acting essentially as office manager, and she was a vice president in both corporations during the years at issue. Accounting practices
During the years in issue, Robert Ojeda ("Mr. Ojeda") performed accounting services for AWC, PRD, and the Barretts individually. Mr. Ojeda is a Certified Public Accountant and at that time was a partner in an accounting firm known first as Stern, Farina, Ojeda & Company and later as Farina, Ojeda & Company. Before Mr. Ojeda was hired as the AWC/PRD outside accountant in late 1974 or early 1975, the accountant for AWC and PRD was Irving Schwartz, the outside accountant for National Roofing. During the period he was the accountant for AWC and PRD, Mr. Ojeda provided certain audited financial statements of the corporations, prepared income tax returns *252 for the corporations, and periodically posted adjusting and closing entries for the corporation's general ledgers in the process of preparing financial statements. The corporate ledgers and journals were maintained on a day-to-day basis by Ms. Gibb. Except for Mr. Ojeda's posting of adjusting entries and specialty entries such as depreciation and prepaid interest, all entries in the accounting records were made by Ms. Gibb. In preparing tax returns and financial statements, Mr. Ojeda generally relied on Ms. Gibb's maintenance of the subsidiary ledgers, such as the purchases journal, cash receipts journal, and cash disbursements journal, and he did not thoroughly review those subsidiary ledgers. Mr. Ojeda (or his firm) prepared the Barretts' individual income tax returns for the years 1974, 1975, and 1976, and the corporate income tax returns for PRD's years ending September 30, 1975 and 1976, and AWC's years ending April 30, 1975 and 1976. Mr. Ojeda would visit the corporate offices approximately six times per year to perform his services. In performing his accounting services, Mr. Ojeda would spend most of his time working alone with the accounting records or working with Ms. *253 Gibb and asking questions of her. Mr. Ojeda would meet with petitioner only for a short time, generally less than an hour, upon the completion of his tasks at the end of the day, and he then would discuss with petitioner and Ms. Gibb any general trends, recommendations, or problems which he had noticed. One recommendation made by Mr. Ojeda, which the corporations put into practice, was to combine the reporting of salary income to petitioner and Ms. Gibb for purposes of withholding taxes, so as to allow the corporations, as well as the Barretts, to pay lower social security taxes. Prior to 1975, payroll taxes were withheld from the salaries of both petitioner and Ms. Gibb, and each received both a Form W-2 (to reflect salary) and a Form 1099 (to reflect commissions) from AWC. For 1975 and 1976, however, W-2 Forms and payroll tax withholding forms were filed with the Federal government reflecting only petitioner, and not Ms. Gibb, as being an employee receiving wages from AWC or PRD. This was done notwithstanding AWC's issuance of, at first, two weekly payroll checks, one in petitioner's name and one in Ms. Gibb's, from January through July of 1975, and thereafter, one weekly check *254 in only Ms. Gibb's name for almost all of the 73 weeks of August 1975 through December 1976. [2]
Petitioner's involvement with the corporations' finances was, in general, somewhat limited. Besides relying on Mr. Ojeda to spot financial trends, petitioner also would review monthly schedules of accounts payable, accounts receivable, estimated payroll, and checking account balances prepared by Ms. Gibb. Petitioner would rely upon those schedules and thumb through the cancelled checks returned with the bank statements as a means to try to manage the businesses' cash flow and monitor the progress of the businesses. Petitioner, however, did not get involved with reviewing the journals and other accounting records; in this regard he relied upon Ms. Gibb and Mr. Ojeda and their handling of the financial records. Both petitioner and Ms. Gibb had separate checking accounts, savings accounts, and credit card accounts from before their marriage that they retained during the marriage. During the first couple of years of the Barretts' marriage, petitioner paid most of *255 the household bills out of his personal checking account, and Ms. Gibb used her personal account to pay her personal expenses, such as doctors' bills. In about June 1975, however, Ms. Gibb began to handle the personal finances for both her and her husband. There were several reasons why petitioner and Ms. Gibb agreed upon her taking responsibility for their personal finances. Petitioner worked 60-80 hours per week for AWC and PRD and was sometimes out of town with that work. As a result of his work activities, petitioner sometimes "bounced" checks and was otherwise negligent in managing the couple's personal finances. Ms. Gibb's description of petitioner's experience with the personal finances was that "he screwed up all the time." For example, before Ms. Gibb began handling the bills, telephone service had been disconnected once or twice, electricity service had been "turned off," and the apartment landlord had sent nonpayment notices and threatened eviction, all because of untimely payment of bills. An additional reason for Ms. Gibb to handle the couple's personal finances was that she often went to the bank for AWC or PRD, and it made sense for her to handle personal banking *256 matters at the same time and thereby eliminate additional trips to the bank. After Ms. Gibb took over responsibility in mid-1975 for the couple's personal finances, petitioner's separate account had little activity -- only seven checks written (totalling $ 445) and only two deposits made (totalling $ 703.83) -- before the account was closed in June 1977. Ms. Gibb used her own separate account for the couple's financial affairs until late March of 1976, when the couple opened a joint checking account at Summit and Elizabeth Trust Co., the same bank at which AWC's corporate checking account was located and one which allowed "deficit draws" on the couple's joint account. (PRD's corporate checking account was at Midlantic National Bank, the bank at which Ms. Gibb kept her separate checking account.) Ms. Gibb's control of the Barretts' finances is illustrated by only 12 corporate payroll checks being issued in petitioner's name from July 1975 through December 1976; 11 (all but one) of those checks being endorsed by Ms. Gibb, and not petitioner, signing petitioner's name; and, of the 11 checks endorsed by Ms. Gibb, the first nine being deposited in Ms. Gibb's separate checking account *257 and the last two in the joint account. It is unclear whether Ms. Gibb used the joint checking account or her separate account more frequently for the couple's personal finances after March 1976. In any event, however, petitioner did not examine records relating to Ms. Gibb's separate account during the marriage, and he looked at the joint checking account's statements or register only infrequently and not in depth. Before June 1977, petitioner wrote only a few checks on the joint account, all at a time when Ms. Gibb was in the hospital. Besides paying for the Barretts' personal expenses out of her separate checking account and the joint checking account, Ms. Gibb also wrote checks to pay for personal expenses on the corporate checking accounts of AWC and PRD. Respondent asserts, via the statutory notice and his amended answer, that 143 checks, in the total amount of $ 72,283.07, were written on AWC and PRD checking accounts during calendar years 1975 and 1976 for the personal purposes of petitioner or Ms. Gibb and that those checks constitute taxable income for which both petitioner and Ms. Gibb are jointly liable. The payees and amounts of those checks are summarized in Appendix *258 I. Of those checks, one paid to Capitol Lighting ($ 808.55) was signed by petitioner, two of the four paid to Tom Westerlund ($ 2,500 total) were signed by AWC/PRD foreman and general supervisor Roy Smith from a "field account" he maintained, and the other 140 were signed by Ms. Gibb. Ms. Gibb concealed her writing of certain corporate checks from petitioner by omitting them from the monthly schedules she provided for him, and by delaying her entries in the financial records for those checks until after petitioner had reviewed the monthly estimates. Also, she listed many of the personal-purpose checks in the corporate cash and purchases journals as having been paid to a party other than the true payee and as being charged to corporation expense accounts like "purchases" or "job expense." Last, Ms. Gibb arranged for the monthly statements for the corporate checking accounts to be delivered to her before petitioner, and she removed certain of the cancelled checks from the bank statements before giving them to petitioner for his perusal. For example, at a time when Ms. Gibb was out of town in 1976, she arranged for Carol Tick, a friend of hers who lived in a trailer near the corporate *259 offices, to intercept the corporate bank statements and hold them aside so that Ms. Gibb could remove certain checks before the statements and cancelled checks were delivered to petitioner. Specific Checks
Ms. Gibb wrote two corporate checks in 1976, one payable to Master Charge and the other to Heritage Bank, for payments on Ms. Gibb's individual Master Charge credit card account ($ 660.21). She wrote a PRD check to Bloomingdale's in 1976 to pay for charges on her personal charge account ($ 450.15). She also used corporate checks to make payments on VISA ($ 839.83) and American Express ($ 1,648.65) charge card accounts in 1976, but the record does not indicate the charges or the cardholders for which payments were made. American Express and VISA credit cards were used in the businesses of AWC and PRD for job-site expenses, fuel expenses, and salesmen's travel expenses, but Ms. Gibb also had a personal American Express account in her own name during the years at issue. The record does not indicate whether Ms. Gibb or petitioner had a personal VISA card during 1976. Ms. Gibb wrote an AWC check to St. Barnabas Medical Center ($ 256) to pay for emergency room and inpatient *260 services rendered to her in May 1975. Ms. Gibb was admitted to that hospital because she had taken "an overdosage of several drugs, most likely Valium and Librax and Noladar" in an apparent suicide attempt. Petitioner was aware of Ms. Gibb's hospitalization. Ms. Gibb wrote PRD checks to Dr. Robert Egge ($ 200) and The Peer Group ($ 1,225) to pay for medical services rendered in connection with bilateral augmentation mammoplasty (breast enlargement) performed on Ms. Gibb in July 1975. Petitioner was aware that his wife had her breasts enlarged; however, all financial arrangements for the procedure were handled by Ms. Gibb. The check paid to The Peer Group was listed in PRD's cash disbursements journal as a purchase from "W. R. Grace & Co." - PRD's major supplier. Ms. Gibb wrote an AWC check to Thomas Newmann, D.D.S. ($ 55) for dental services rendered by the Barrett family dentist in 1975. Of that payment, $ 36 is attributable to services for Ms. Gibb, and the bill does not indicate to whom the other $ 19, for a cavity refill, is attributable. Ms. Gibb wrote other AWC checks during the years in issue to Dr. Robert O'Driscoll ($ 350) to pay for gynecological surgery performed *261 on Ms. Gibb in July 1976, and to Dr. Philip Miller ($ 105) to pay for opthamology services. Both petitioner and Ms. Gibb "saw" Dr. Miller. During the years in issue, Belden & Eberhardt ("B & E") was a New Jersey law firm which served as corporate counsel to AWC and PRD and also represented petitioner and Ms. Gibb in various personal matters, including two real estate purchases. Two of the corporate checks in issue were paid to B & E's Trust Account. One of the payments to the B & E Trust Account was an AWC check dated May 22, 1975, in the amount of $ 3,968.57. The check paid for closing costs and part of the purchase price for a lot located in Tewksbury Township, New Jersey, which was purchased in the name of Timothy M. Barrett and Susan G. Barrett on May 28, 1975 (the "Tewksbury lot"). Petitioner did not attend the closing for the sale of the lot. The second payment to the B & E Trust Account was a PRD check dated March 18, 1976, in the amount of $ 7,297.05. That check was used to pay for closing costs and part of the $ 60,000 purchase price for a new custom-built house in Glen Gardner, New Jersey, purchased in the names of Timothy M. Barrett and Susan G. Barrett on March 19, 1976 ("the *262 Glen Gardner house"). Ms. Gibb listed the payee of that check in PRD's cash disbursements journal as "W. R. Grace." Several corporate checks also were used to purchase goods and services for the Barretts' Glen Gardner house. On February 27, 1976, petitioner (not Ms. Gibb) wrote a PRD check to Capitol Lighting ($ 808.55) to pay for household fixtures installed at the Glen Gardner house. The cost of those household fixtures reflected a reduction for a contractor's discount which petitioner had managed to obtain. Two AWC and two PRD checks were used to pay Thomas Westerlund for carpet he installed at the Glen Gardner house in March 1976. Although two of the four checks ($ 2,500 out of total $ 3,405) were signed by Roy Smith, a PRD and AWC foreman, and issued on field checking accounts maintained by Mr. Smith, Ms. Gibb gave all four checks directly to Mr. Westerlund while petitioner was not present. Mr. Westerlund was not an employee of either AWC or PRD during 1976, the year of the checks' issuance. On March 5, 1976, Ms. Gibb wrote a PRD check to John Conway in the amount of $ 4,249.60. That check was used to pay for bedroom furniture for the Glen Gardner house. The furniture *263 was purchased "at cost" directly from a factory in North Carolina through an All-Weather Crete franchiser in North Carolina whom petitioner knew. The payee of the check was listed in PRD's cash disbursements journal as "Lone Star Inds." - a corporation which appears to be a major supplier for PRD. Ms. Gibb wrote an AWC check on March 18, 1976, to purchase a refrigerator, a washer, and a dryer for the Glen Gardner house from FAD Company ($ 1,430.10), and another AWC check on April 15, 1976, to purchase household furniture from Eber's Furniture ($ 397.95). In AWC's cash disbursement journal, no payee is listed for either of those checks, and the offsetting accounts to which the checks are charged are "Accounts Payable" and "Job Expense," respectively. On October 20, 1976, Ms. Gibb also wrote another AWC check to purchase eight chairs for the Glen Gardner house from Knoll International ($ 1,144.50). The AWC purchases journal charges the checks paid to "Fad" and "Knoll Int" to the purchases account. In 1976 Ms. Gibb arranged to have a fence installed at the Glen Gardner house. She wrote two AWC checks to John Rudl & Sons Fencing in September 1976 to purchase fence gates and rails *264 ($ 510.40). Lumber for the fence also was purchased from Pickering Lumber and Supply Company ("Pickering"). Respondent asserts that the Barretts' 1976 taxable income should include four corporate checks paid to Pickering in August, September, and December of 1976 as amounts paid for the fence at the Glen Gardner house. In the corporate cash disbursement journals, the payees of those four Pickering checks are listed as: (1) "Union Lumber" ($ 723.36); (2) "Lumber & Supply Co." ($ 85.60); (3) no named payee with an offsetting charge to "Job Expense" ($ 408.98); and (4) "Pickering" ($ 177.27). The purchases journals comport with the cash disbursements journals for the listed payees of those checks: the checks listed as paid to Lumber & Supply Co. and Pickering are charged to job expense, and the check listed as paid to Union Lumber is charged partly to purchases and partly to job expense. During the years in issue, the purchase of lumber was a regular expense for corporations in the roofing business like AWC and PRD. Ms. Gibb hired two individuals, Richard Koza and Ed Oathout, to install the fence at the Glen Gardner house. Mr. Koza and Mr. Oathout each received eight AWC checks *265 during the period from June 1976 through December 1976 in the total amounts of $ 1,977.50 and $ 1,851, respectively, to pay for labor and out-of-pocket expenses. Neither Mr. Koza nor Mr. Oathout was an employee of AWC or PRD during 1976. During 1975 and 1976, Mark Bromley performed gardening and landscaping services for the corporate premises. The parties have stipulated that Ms. Gibb hired Mr. Bromley in 1976 to cut the lawn and shrubs at the Glen Gardner house, also. Respondent's amended answer asserted that the Barretts' taxable income included the following AWC checks paid to Mr. Bromley: Date
Amount
10/14/75
$ 300.00
4/27/76
107.85
5/11/76
300.00
6/1/76
545.90
In November 1976, Ms. Gibb wrote two corporate checks to Harrington's, Inc. for the purchase of liquor ($ 189.05). The items purchased from Harrington's, Inc. were used both for Christmas gifts for business customers and for the Barretts' personal use. On December 11, 1976, Ms. Gibb wrote a PRD check to Reuben H. Donnelley Corporation in the amount of $ 142.72 to purchase an Official Airline Guide. That payment was recorded in the PRD purchases journal as being for advertising. During *266 the years in issue, AWC and PRD used Monarch Travel, Inc. ("Monarch Travel") to make arrangements for business travel. Such travel included the attendance at sales meetings and conventions by petitioner, his father (a PRD and AWC shareholder and director), salesmen, and at times their wives. In addition, the corporations' employment arrangement with foreman Roy Smith was such that the corporations paid for a certain number of trips per year for Mr. Smith to fly to Chicago, Illinois, where his family lived. During 1976 and 1977, Monarch Travel employed Ms. Gibb on a part-time basis as an outside salesperson, and petitioner was aware of that arrangement. As a registered travel agent, Ms. Gibb individually received discounted airfare and travel accommodations and was paid a commission by Monarch Travel for each trip she booked. In 1976 Ms. Gibb received two commission checks from Monarch Travel in the total amount of $ 349.51, and respondent determined in the notice of deficiency that the Barretts had $ 350 of unreported taxable income from those two checks in 1976. During 1976 and 1977, Ms. Gibb caused AWC and PRD checks to be written to Monarch Travel and credited to her account *267 at the agency. Ms. Gibb used those credits in booking trips for clients or as credit towards the cost of vacations. Respondent determined that eight corporate checks written by Ms. Gibb in 1975 and 1976 to Monarch Travel constitute taxable income to the Barretts. In 1976 Susan Tiger took care of Ms. Gibb's great-uncle, who was terminally ill with cancer and staying with the Barretts in their home. To pay for Mrs. Tiger's services, Ms. Gibb wrote five AWC and PRD checks in 1976 payable to Allen Tiger, Mrs. Tiger's husband, in the total amount of $ 900. [3] Those checks were issued to Allen Tiger rather than to Mrs. Tiger because Mrs. Tiger was collecting unemployment compensation benefits and did not want checks for her services drafted in her name. In the corporate cash disbursement journals, the offsetting charge for the checks paid to Allen Tiger was left blank or was listed as "Subcont" or "Sub", and there was no listed payee for two of those five checks. Neither Allen Tiger nor Susan Tiger ever was employed by AWC or PRD. *268 During 1975 and 1976, Ms. Gibb owned a 1953 MG sports car, and Frank Ogden performed repair work on that MG in 1975. Mr. Ogden, however, was not merely Ms. Gibb's automotive mechanic: Ms. Gibb, in conversations with an AWC/PRD employee, described Mr. Ogden as someone with whom she had a "torrid affair." During 1975 Ms. Gibb wrote 14 corporate checks to Mr. Ogden in the total amount of $ 4,871.53. To pay for repair work on the MG in 1976, Ms. Gibb wrote one PRD check to Jack's Auto Repair ($ 294.30) and three corporate checks to David Stagg ($ 619 total). In the cash disbursements journal, the payee of at least one of those checks to David Stagg was listed as "Billy Shockley." Ms. Gibb also owned a 1972 Oldsmobile automobile. On October 30, 1975, she wrote an AWC check in the amount of $ 450 to pay for the painting of that automobile by Peter Zartin, a friend of petitioner's who was not an AWC employee but who several months earlier had been paid for painting an AWC truck. In the AWC purchases journal, Ms. Gibb charged the payment to Peter Zartin to the expense account for Truck, Auto, & Equipment Repairs. On June 18, 1975, Ms. Gibb wrote a PRD check to Joseph S. Seidel, *269 Esq. in the amount of $ 130. In PRD's cash disbursements journal, the payee of that check was listed as "Beldon & Eberhart [sic]," the corporate counsel for AWC and PRD. From May 1975 until June 1977, Linda Padden Stagg ("Mrs. Stagg") was employed by AWC as an assistant to Ms. Gibb. While employed at AWC, Mrs. Stagg married Philip Stagg ("Mr. Stagg"), the individual who referred Ms. Gibb to David Stagg (Mr. Stagg's cousin) for the repair work performed on Ms. Gibb's MG. In October 1975, Ms. Gibb proposed, as a method by which Mrs. Stagg could afford to pay for her upcoming wedding to Mr. Stagg and honeymoon, a scheme whereby Ms. Gibb would write corporate checks to Mrs. Stagg and Mrs. Stagg would cash the checks and split the proceeds with Ms. Gibb. During the following three months, Ms. Gibb wrote 20 AWC checks and 13 PRD checks, each in the amount of $ 500, to either Mrs. Stagg or Mr. Stagg in the total amount of $ 16,500. As Mr. and Mrs. Stagg (the "Staggs") cashed the checks, they returned the cash to Ms. Gibb. During the first few weeks, Ms. Gibb allowed Mrs. Stagg to retain part of the proceeds of each check, but Ms. Gibb, after a time, ceased to return any of the proceeds. *270 During 1975 Mrs. Stagg received $ 6,487 in wages from AWC as Ms. Gibb's assistant and received a Form W-2 to reflect those earnings. Mr. Stagg did not perform any services for AWC or PRD in 1975. Ms. Gibb caused four Forms 1099 (Miscellaneous Income - Commissions and fees to non-employees) from AWC and PRD to be issued to Mrs. Stagg and Mr. Stagg to reflect the non-payroll corporate checks written to them. [4]
In 1977 Ms. Gibb asked Mrs. Stagg to engage with her once again in a scheme for cashing corporate checks, but Mrs. Stagg this time did not agree to go along with Ms. Gibb. On June 2, 1977, Ms. Gibb fired Mrs. Stagg from her position at AWC on the grounds that Mrs. Stagg was an alcoholic and was incompetent in her position as a secretary. Carol Tick ("Ms. Tick") is a former National Roofing employee who first met Ms. Gibb through National Roofing. In 1974 Ms. Tick resigned from National Roofing and established a secretarial and word processing business by *271 the name of Executive Secretary, but she remained a close personal friend of Ms. Gibb after leaving National Roofing. In 1975 Ms. Gibb asked Ms. Tick to participate in a scheme whereby Ms. Gibb would write AWC checks payable to Ms. Tick, and Ms. Tick would cash the checks and return the proceeds to Ms. Gibb. In 1975 and 1976, in accordance with that scheme, Ms. Gibb wrote and Ms. Tick cashed (1) four AWC payroll checks, each in the amount of $ 451.20, payable to Ms. Tick individually; (2) two AWC checks, in the amounts of $ 254.50 and $ 255, payable to "Executive Secretary;" and (3) two AWC checks in the amounts of $ 500 and $ 150, payable to "Cash." The two checks payable to "Cash" were endorsed by Ms. Tick. In AWC's cash disbursements journal, Ms. Gibb listed the payees of those checks written to "Executive Secretary" and "Cash" as follows: Check Amount
Payee on Check
Payee in C/D Journal
$ 500.00
Cash
Markin Crane
150.00
Cash
Cash-Into P.C. [Petty Cash] 254.50
Executive Secretary
Trimmer & Haas
255.00
Executive Secretary
Wm Temple VOID *
The description *272 in the cash disbursements journal beside the $ 500 check to Cash (Markin Crane) was "Equip Rent". Descriptions were not provided for the other three checks listed above, including the $ 255 check which was incorrectly listed as having been voided. Although the total amount paid via the eight checks payable to Ms. Tick, Executive Secretary, and Cash is $ 3,524.30, respondent included only $ 3,469.80 from those checks in the Barretts' taxable income. Respondent excluded $ 54.50 from the Barretts' taxable income on the grounds that Ms. Tick partially repayed AWC by a check in the amount of $ 54.50. Ms. Tick made such a payment in order to reimburse AWC for the costs of covering Ms. Tick under AWC's group medical insurance policy. Ms. Gibb had placed Ms. Tick on the AWC payroll as a means by which Ms. Tick could acquire cheaper medical insurance coverage under the AWC group plan, and Ms. Tick had reciprocated by cashing the corporate checks and returning the funds to Ms. Gibb. Respondent included in the Barretts' taxable income four corporate checks paid to American National Bank ($ 3,259.70), but the record contains no evidence regarding those checks, other than the parties' stipulation *273 that Ms. Gibb maintained separate "other accounts" at a bank by that name. Respondent also included in the Barretts' taxable income corporate checks written by Ms. Gibb to Randy Krogell and Curry Leisure Time Sales in the total amounts of $ 1,340 and $ 230, respectively. The record contains no evidence as to the purposes of the following corporate payments included as taxable income in the notice of deficiency: Bottle King
$ 285.60
M & M
51.53
Morrell & Co.
212.56
Town and Country Liquors
277.95
C. Dyda
140.00
Bill Frazel
385.00
Richard Luster
90.00
Ms. Gibb and petitioner made plans through Monarch Travel to vacation together in Tahiti in May 1977. Shortly before the scheduled departure, however, Ms. Gibb informed petitioner that she had cancelled his ticket for the trip, and that she planned to go to Tahiti alone so that she might reflect on the quality of their marriage. Soon after Ms. Gibb's return from Tahiti, she and petitioner discussed ending their marriage. No legal action was taken toward that end, however, until petitioner filed a divorce suit against Ms. Gibb on June 20, 1977. The Divorce
Petitioner was spurred to file the suit *274 for divorce by a conversation he had with Roy Smith, the AWC/PRD foreman mentioned above. Mr. Smith had heard that the Barretts were planning to separate, but that Ms. Gibb was going to continue to work for AWC/PRD. After confirming that rumor with petitioner, Mr. Smith told petitioner something to the effect of, "Well, I'm afraid if you let that happen, I'm not going to have a job because she's basically robbing you blind." Mr. Smith then informed petitioner about the schemes involving the Staggs and Carol Tick, whereby Ms. Gibb was extracting funds from AWC and PRD. Mrs. Stagg and Ms. Tick later confirmed the allegations made by Mr. Smith in his comments to petitioner. Mr. Smith knew about Ms. Gibb's schemes some time before his conversation with petitioner; however, he did not inform petitioner earlier because he was worried that Ms. Gibb might inform Mr. Smith's wife in Chicago of the fact that Mr. Smith was having an affair with Ms. Tick when he was in New Jersey. Petitioner's divorce complaint against Ms. Gibb included, inter alia, the following sworn assertions made by petitioner, as plaintiff: 5. In [1975], at a time when the plaintiff returned unexpectantly [sic] *275 early from a business trip to Philadelphia, he was unable to open the door to his apartment and when he finally gained admittance, he found the defendant in a state of undress and quickly determined that an individual subsequently identified as Frank Ogden, had fled from the marital abode, jumping from the balcony thereof. The defendant admitted an act of infidelity which had occurred in the marital abode and the plaintiff accordingly then and there demanded a divorce. Needless to state the plaintiff was emotionally and physically distraught as a direct result of the defendant's unfaithfulness. 6. Shortly after the above described act of unfaithfulness, the defendant attempted to take her own life and was admitted to the St. Barnabas Hospital in Livingston, New Jersey * * * * * * 8. Upon the defendants return from [her May 1977 vacation in] Tahiti, she announced to the plaintiff's shock and despair that contrary to her previously expressed plans of remaining alone in solitude, she had spent an entire week on a yacht with three men and no other women. Moreover, the plaintiff observed to his distress that the defendants breasts had been exposed to the sun, indicating that *276 she had disrobed while on the boat with said men. Subsequently, the plaintiff, on information and belief, thereafter verified by the admission of the defendant, that she had, on leaving New Jersey [en route to Tahiti] on May 13, flown directly to a male acquaintance of hers known as "Lutzy" where she had stayed at his apartment [in] Woodland Hills, California. This deceit added to the other deceits practiced upon the plaintiff, further demoralized him. 9. The plaintiff, upon being confronted with the myriad admissions and deceits mentioned above, requested the defendant to be candid with him about her objectives in the marriage. The defendant thereupon stated that she wished the marital relationship terminated and that she had not had love for the plaintiff for two years adding, to the plaintiff's chagrin and embarrassment, that she had not been sexually gratified by the plaintiff for that same period of time. * * * 13. Plaintiff, on information and belief,asserts that the defendant who has functioned as a bookkeeper in a business operated by the plaintiff, has without authorization or justification, converted to her own use, diverse sums of money. All of said sums, *277 when fully calculated and discernable, [are] alleged as set offs against such rights of equitable distribution as the defendant may possess in this litigation. Approximately one week after petitioner filed his divorce suit, Ms. Gibb filed a reply in which she countersued for divorce and made many sworn assertions which both petitioner and Ms. Gibb described as being very nasty. Among the assertions made in Ms. Gibb's certified (sworn) statement was the following: The Plaintiff and I, during the course of our marriage, have acquired assets worth in excess of a quarter of a million dollars, which assets were utilized predominantly in business enterprises which generate substantial cash flows, and additionally have always allowed us to throw off taxable income at the rate of $ 50,000 a year in addition to various [emoluments] that ran to our benefit and were not included in our income tax returns. Ms. Gibb also made other certified statements and allegations during the course of the divorce litigation, but many of those sworn statements were knowingly false. Shortly after filing the divorce suit, petitioner and his attorney's secretary went to Mr. Ojeda's office at a *278 time when petitioner knew Mr. Ojeda would be away from his office. Certain AWC and PRD records were at Mr. Ojeda's office, and petitioner went there to retrieve those records, as well as any "incriminating evidence" which might be in Mr. Ojeda's files. Once petitioner was able to get the records in his presence, petitioner picked up the records, gave Mr. Ojeda's secretary a subpoena, and walked out of the office with the records. [5] Petitioner's retrieval of the records was surreptitious, but was based on petitioner's concern that if Mr. Ojeda had notice and could review the files before petitioner could retrieve them, any incriminating evidence possibly contained in the files might be destroyed. Petitioner was suspicious of Mr. Ojeda because Mrs. Stagg, during petitioner's inquiry about Ms. Gibb's scheme, told petitioner that Mr. Ojeda had used his firm to bill the corporations for a country club membership for Ms. Gibb and had made comments about filtering moneys out of AWC and PRD because the corporations' profits were too high. *279 After June 1977, Ms. Gibb was "banished" from the AWC/PRD headquarters, and she was present at the headquarters after that time only when accompanying auditors she hired to value the corporations. [6] After Ms. Gibb was expelled from the corporations, the AWC and PRD employees could not find many checks and other corporate documents. Over the next several months, however, certain cancelled corporate checks were found in various files or drawers separate from the bank statements and the other cancelled checks. Among the checks so segregated were checks made out to the Staggs and to Frank Ogden. On August 31, 1977, in response to an inquiry from Ms. Gibb, the owner/operator of Monarch *280 Travel wrote Ms. Gibb a note which included the following paragraph: I spoke to my accountant and he informs me that I cannot refund to you the money you have given us. The reason for this is that the checks were in [AWC's] name and also [PRD's] and any refunds must be made directly to the firm which sent the check. On December 28, 1977, Monarch Travel issued a check payable to PRD in the amount of $ 1,887.65, which contained the notation "Refund for paid and cancelled reservations All Weather Crete & Polylite Roof Decks." Upon receipt of the check, petitioner divided the proceeds evenly between PRD and AWC. On April 9, 1979, prior to any contact by the Internal Revenue Service regarding himself, Ms. Gibb, AWC, or PRD, petitioner filed an amended Federal income tax return for the 1975 year. The amended return reported an increase in total income of $ 5,105, was filed along with petitioner's check for $ 3,245 of additional tax, and offered the following explanation for the amendment: Inclusion of one-half funds embezzled by estranged spouse and used for joint benefit without knowledge of taxpayer. Although original return was filed jointly this return is filed without *281 signature of estranged spouse due to spouse's refusal to sign. Matrimonial litigation is in progress in Superior Court, Morris County, N.J.
During the course of the divorce proceedings, Ms. Gibb, after she had moved out of the Glen Gardner house and while petitioner still was living there, broke into that home and took a number of papers and a diamond ring. For those actions, Ms. Gibb was held in contempt of court and ordered to pay petitioner $ 800 for attorney's fees. In October 1979, petitioner and Ms. Gibb entered into a property settlement agreement which was included as part of a final divorce judgment entered by the court on December 10, 1979. In that property agreement, petitioner agreed that Ms. Gibb was entitled, as an equitable property distribution, to: $ 90,000 in cash, payable in three installments; a pinky ring; a statuette of "Wendy;" a mink coat (which had been given to Ms. Gibb by her grandmother); a gold bracelet; proceeds from the sale of a Thunderbird automobile; two poodle dogs; and all personal clothing and toiletry items. Ms. Gibb, in turn, agreed that petitioner was entitled to all other property acquired during the course of the marriage, including *282 all other jewelry, the MG sports car, the Glen Gardner house, and the Tewksbury lot. Although Ms. Gibb was required under the property agreement to deliver certain diamond jewelry to petitioner, she removed and sold the diamonds from that jewelry and replaced the diamonds with much less valuable zirconium before delivering the jewelry to petitioner. Ms. Gibb also did not deliver the MG automobile as required. Instead, petitioner found the MG in a storage lot, where it was in a cannibalized condition and had storage fees accrued of $ 6,000 - $ 7,000. Petitioner attempted to recoup the diminished value of the MG and jewelry by withholding payment of part of the cash owed by him under the property agreement, and he asked the marital court to modify his cash obligation to Ms. Gibb. [7] Before that issue could be resolved, however, Ms. Gibb, together with a corporation she organized and operated after the Barretts' separation, declared bankruptcy in 1980, and the bankruptcy trustee sued petitioner for the cash he owed under the property settlement. The litigation with the bankruptcy trustee spanned six to eight months before concluding. Petitioner paid in excess of $ 100,000 in legal *283 fees in pursuing and defending various suits and claims involving Ms. Gibb. Subsequent Events
During the course of the divorce proceedings, Ms. Gibb made several allegations regarding conduct by petitioner and other members of his family in the operation of the various business enterprises run by petitioner's family. Based upon those allegations, Leo Kessler ("Mr. Kessler"), a 25-percent or 50-percent shareholder in AWC and other Barrett family corporations, filed a lawsuit in New Jersey Superior Court on June 29, 1979, against Emmett Barrett (petitioner's father), AWC, PRD, and several other corporations owned by the Barrett family. Mr. Kessler's suit alleged, inter alia, that the directors and officers of the corporations had committed fraud, embezzlement, and misuse of corporation funds. In January 1980, in a deposition relating to that lawsuit, Mr. Kessler stated that his allegations of fraud and embezzlement were based solely upon Ms. Gibb's allegations in the divorce litigation and a newspaper article publicizing the Barretts' *284 divorce proceedings. After a bench trial, the New Jersey Superior Court dismissed with prejudice against Mr. Kessler those counts of his suit involving fraud, embezzlement, and misuse of corporate funds. In addition to dismissing those counts, the New Jersey Superior Court also ordered that (1) AWC, as well as certain other corporations owned by both Mr. Kessler and the Barrett family, cause certified financial statements to be prepared for the fiscal years ending in 1982 and all years thereafter; (2) Mr. Kessler's request that AWC and another Barrett family corporation purchase his stock therein was denied; and (3) all other claims of the parties were dismissed, in anticipation that the parties would settle those claims. The remaining claims, which essentially involved intercompany billing accounts among the various corporations, subsequently were resolved by the litigants through arbitration. On March 11, 1980, the Supreme Court of New Jersey upheld a conviction of Mr. Ojeda, the Barretts' accountant during the years in issue, for conspiracy [8] and Medicaid fraud. State v. Hoffman,82 N.J. 184, 412 A.2d 120 (1980). On account of that conviction, Mr. Ojeda *285 was sentenced to 90 days in jail and his license to practice accounting was suspended for two years. Mr. Ojeda's conviction was based on his preparation as an accountant of cost study reports of patient-related expenses used to secure payment of Medicaid funds, "knowing that [the reports] included numerous, personal expenses of the [owners of three nursing homes] as well as other non-patient related expenses." 412 A.2d at 120. The original grand indictment of Mr. Ojeda was filed on July 30, 1975, during the earlier of the two years in issue. On their Federal income tax returns for the years in issue, the Barretts reported the following adjusted gross incomes: 1975
1976
Salary
$ 40,950 $ 65,950 Business Income-sales
8,196 -- Interest Income
-- 118 Individual Retirement Arrangement
(1,500)
(1,500)
$ 47,646 $ 64,568 On both of those returns, the occupations of petitioner and Ms. Gibb were reported as sales manager and housewife, *286 respectively. On their Federal income tax returns for the years ending as indicated, the corporations reported the following items (before taking into account carrybacks and carryforwards of net operating losses): PRD
9/30/76
9/30/77
9/30/78
9/30/79
Gross Receipts
$284,319
$297,724 $738,460 $509,013
Gross Profit
102,221
29,626 72,343 119,576
Officers' Compensation
-0-
-0- -0- 23,400
Taxable Income (Loss)
36,221
(65,180)
(269)
59,514
AWC
4/30/76
4/30/77
4/30/78
4/30/79
Gross Receipts
$972,660
$342,791  $963,843 $1,741,427  Gross Profit
268,968
127,693 358,079
465,512
Officers' Compensation
30,545
49,400 38,250
40,300
Taxable Income (Loss)
17,724
(92,088)
19,604
182,420
Each of those returns reflects no dividend distribution to shareholders. PRD's initial tax return for the period May 1, 1975, through September 30, 1975, and AWC's tax return for the year ended April 30, 1975, are not in evidence, but other tax returns in evidence indicate that PRD reported taxable income of $ 50,524 for the period ended September 30, 1975, and that AWC reported *287 taxable income of $ 1,016 for the year ended April 30, 1975. Based upon a newspaper article about the Barretts which discussed embezzlement of funds from AWC and PRD, agents of the Criminal Investigation Division ("CID") of the Internal Revenue Service began an investigation in September 1979 of the income tax liabilities of petitioner, Ms. Gibb, AWC, and PRD for the years 1974 through 1977. Ms. Gibb, on the advice of counsel, invoked her privilege against incrimination under the Fifth Amendment to the U.S. Constitution (the "Fifth Amendment privilege") and refused to discuss any tax matters with the agents. Petitioner invoked his Fifth Amendment privilege in response to questions asked by the CID agents regarding AWC, PRD, the corporate tax returns, the Barretts' individual tax returns, or Ms. Gibb during the years 1975 and 1976. The investigating agents, however, had access to and did review the various certified statements made by Ms. Gibb and petitioner during the divorce proceedings, including an affidavit of petitioner, dated January 16, 1978, in which he, inter alia, made reference to "the monies embezzled by [Ms. Gibb] during 1975." The agents also interviewed numerous *288 (over 100) third-party witnesses and examined whatever documentation AWC and PRD had available. The CID investigation took over a year to complete and involved approximately 1000 hours of investigation time. Based upon its investigation, the CID issued a report in June 1981 which recommended that Ms. Gibb be prosecuted for willfully attempting to evade income taxes for 1975 and 1976 in violation of section 7201. The record does not indicate, however, whether Ms. Gibb ever was convicted of such a crime or even went to trial. The CID issued other reports which recommended no prosecution of petitioner, AWC, or PRD, and made the following comments in its reports: There is no evidence either in the divorce proceedings of in the Special Agent's investigation that TIMOTHY BARRETT had any knowledge that corporate checks were being used to pay for his wife's credit cards, to generate cash for herself or for the upkeep of their residence. and Although he was married to SUSAN during 1975 and 1976, no evidence has been uncovered to prove that [petitioner] was aware of the magnitude of her embezzlement activities until late 1977 when he filed a suit for divorce. After the completion *289 of respondent's CID investigation, a civil tax investigation of the Barretts' individual returns was begun in late 1981 by a revenue agent who had assisted the CID in the criminal investigation. On March 12, 1982, copies of a joint notice of deficiency were sent to petitioner and to Ms. Gibb. The deficiencies in the statutory notice were attributable almost totally to corporate checks identified in the CID investigation. The statutory notice asserted the following increases/(decreases) in the Barretts' taxable income: 1975
1976
AWC checks
$25,995 $  6,768
PRD checks
9,743 20,138
Amount reported on amended return
(5,105)
--
Monarch Travel commissions
-- 350
Additional medical expenses (paid by
corporate checks), net of the
increased section 213 limits
(928)
--
$29,705 $27,256
In his amended answer, respondent asserted increased deficiencies based upon increased taxable income in the total amounts of $ 1,600 and $ 8,039 for 1975 and 1976, respectively, attributable to additional diverted corporate checks. OPINION 1. Statute of Limitations
We first address petitioner's argument that the statute of limitations bars *290 assessment of the deficiencies against him because the statutory notice was mailed more than three years after the filing of the 1975 and 1976 tax returns. See sec. 6501(a). Petitioner acknowledges in his reply brief that, under the authority of Vannaman v. Commissioner,54 T.C. 1011, 1018 (1970), and section 6501(c)(1), [9] a showing of fraud on the part of Ms. Gibb removes the bar of the statute of limitations on the returns as to both him and Ms. Gibb, even absent a showing of fraud on petitioner's part. Petitioner contends, however, that fraud has not been proved against Ms. Gibb. We appreciate that Ms. Gibb's concession of her liability for the fraud addition (under section 6653(b)) on any adjudged deficiency does not estop petitioner from rebutting respondent's assertion that there was fraud in the filing of the returns. Vannaman v. Commissioner,54 T.C. at 1018. *291 Nevertheless, we think it is clear that, at the time the returns were filed, Ms. Gibb had the intent to file a fraudulent return and evade tax. Even without considering Ms. Gibb's concession of the fraud addition under section 6653(b) as evidence of fraud, the record contains clear and convincing evidence establishing Ms. Gibb's fraudulent intent for both of the years in issue. In 1975 Ms. Gibb wrote corporate checks to the Staggs, Frank Ogden, and Carol Tick, among others. Although it is not clear whether Mr. Ogden shared with Ms. Gibb any of the sums paid him or whether he simply kept the payments, it is clear that Ms. Tick and the Staggs did return to Ms. Gibb most of the cash from the corporate checks they received. None of that returned cash was reported on the Barretts' 1975 tax return. That Ms. Gibb listed in the cash disbursements journals different payees for the checks to Ms. Tick and others, and that she felt compelled to segregate and hide certain cancelled checks, such as those to the Staggs and Frank Ogden, combine to show convincingly Ms. Gibb's studied and deliberate efforts to conceal evidence of her "ill-gotten gains" from taxation, if not also from petitioner. *292 See Vannaman v. Commissioner,54 T.C. at 1020. In 1976 Ms. Gibb continued her scheme of entering incorrect payees in the corporate cash records. Ms. Gibb knew that the checks she wrote to FAD Co., Eber's Furniture, John Conway, and others were payments for furniture and appliances for her home, not for corporate purchases or job expenses, as she reflected in the corporate journals. Such evidence, when combined with the failure of Ms. Gibb, who provided most of the information for the Barretts' individual tax returns to Mr. Ojeda, to report such payments as income on her and petitioner's individual income tax return, once again shows a clear intent to evade Federal tax liability on the corporate payments used to benefit Ms. Gibb. We categorically reject any contention that Ms. Gibb was confused or merely careless in her incorrect recording of checks in the corporate journals and her failure to include the benefits received from corporate funds on the individual tax returns. Any such contention is incredible and completely contrary to the evidence before us. Accordingly, we find that the Barretts' 1975 and 1976 returns were filed fraudulently with the intent *293 to evade tax, so that the statute of limitations does not prevent assessment or collection of the taxes against either petitioner or Ms. Gibb. [10]
2. Deficiency
Petitioner has the burden of proving respondent's determinations regarding the corporate checks in the notice of deficiency are incorrect. Welch v. Helvering,290 U.S. 111, 115 (1933). In this regard, however, we are mindful that "The law imposes much less of a burden upon a taxpayer who is called upon to prove a negative -- that he did not receive that income which the Commissioner claims -- than it imposes upon a taxpayer who is attempting *294 to sustain a deduction." Weir v. Commissionerr,283 F.2d 675, 679 (6th Cir. 1960), revg. a Memorandum Opinion of this Court. Cf. Mysse v. Commissioner,57 T.C. 680, 694 (1972). [11] Respondent bears the burden of proof with respect to the checks first asserted to be includable in taxable income in his amended answer. Rule 142(a). Also, to the extent that petitioner proves he is an innocent spouse under section 6013(e) with regard to the corporate checks, only Ms. Gibb, not petitioner, is liable for any deficiency attributable to such checks. In the interest of brevity, we combine our discussion of the deficiencies and petitioner's status as an innocent spouse. (a) Innocent Spouse
To obtain relief under section 6013(e), the person asserting innocent spouse status must prove that: (1) joint returns were made for each year in issue; (2) there is a substantial understatement of tax attributable to grossly erroneous items of the other spouse on each return; (3) the spouse desiring relief did not know, and had no reason to know, of such substantial understatement when *295 signing each return; and (4) taking into account all the facts and circumstances, it is inequitable to hold the spouse seeking relief liable for the deficiency attributable to such substantial understatement. Sec. 6013(e)(1). In deciding whether it is inequitable to hold a spouse liable for a deficiency, we take into account whether the purported innocent spouse significantly benefited from the items omitted from gross income. Purcell v. Commissioner,86 T.C. 228, 242 (1986), affd. 826 F.2d 470 (6th Cir. 1987); sec. 1.6013-5(b), Income Tax Regs.; H. Rept. 98-432 (Part 2) 1501, 1502 (1984).[12] The requirements of section 6013(e) are conjunctive rather than alternative; a failure to meet any requirement precludes an individual from qualifying as an innocent spouse. Estate of Jackson v. Commissioner,72 T.C. 356, 362 (1979). Respondent does not contest that petitioner filed a joint return with Ms. Gibb for 1975 and 1976, and he does not contest that each of those returns contained a substantial *296 understatement of tax (see section 6013(e)(3) and (4)(E)) attributable to grossly erroneous items (see section 6013(e)(2)(A)). Respondent maintains, however, that petitioner knew or had reason to know of the omissions from the Barretts' reported gross income of the benefits from the corporate checks, and that it would not be inequitable to hold petitioner liable for the deficiencies. Respondent asserts that petitioner had actual knowledge that Ms. Gibb was writing corporate checks to pay for personal items. Respondent's evidence in support of that assertion consists almost entirely of the testimony of Ms. Gibb, who testified that her payment of personal expenses with corporate funds, to the detriment of both the Federal fisc and the unrelated shareholder (Mr. Kessler), was a scheme taught her by petitioner's father, Emmett Barrett, about which petitioner was aware. No other testimony, however, confirmed that petitioner had any such actual knowledge of Ms. Gibb's scheme, even though several former AWC and PRD employees were called to the stand.
We put little credence in any testimony given by Ms. Gibb, because we are unpersuaded that she is an individual given to honesty and forthrightness, *297 at least with respect to anything concerning petitioner. We discount completely her testimony for several reasons. First, many of her statements of testimony in the instant case are contrary to certified statements made by her during the course of the divorce proceedings. For example, after leaving the employ of AWC/PRD and having acquired other employment, Ms. Gibb falsely led the divorce court to believe she was still unemployed in order to continue to receive employment-related payments from AWC/PRD. She characterized that and other admittedly false statements as being merely "garbage that went on during the divorce proceedings" because her attorney was a "young pup" who "was a little overzealous." We seriously doubt that Ms. Gibb's attorney was responsible for all the assertions made in her sworn statements, and, even so, we do not think an individual given to truthfulness would have signed under oath certifications to so many statements known to be false. The outcome of Mr. Kessler's lawsuit against Emmett Barrett and the Barrett family corporations bolsters our conclusion to disregard Ms. Gibb's testimony about petitioner's knowledge. If there were any evidence of petitioner *298 or his father knowingly allowing funds to be siphoned out of AWC and the other corporations for their personal benefit, we think the New Jersey court would not have dismissed with prejudice Mr. Kessler's claims of fraud, embezzlement, and misuse of corporate funds. Additional evidence of Ms. Gibb's untrustworthiness are her intentional falsification of the corporate journals and her replacement of diamonds with zirconium in the jewelry she was obliged to return to petitioner. Lastly, Ms. Gibb at trial admitted that even many statements made in her petition in the instant case are false. In short, our impression of Ms. Gibb's trustworthiness brings to mind the following comment: He who permits himself to tell a lie once, finds it much easier to do it a second and third time, till at length it becomes habitual; he tells lies without attending to it * * *. T. Jefferson, Letter to Peter Carr -- August 19, 1785 (cited in J. Bartlett, Familiar Quotations 388 (15th ed. 1980)). In declining to accept Ms. Gibb's testimony at trial, we appreciate that we are refusing to accept statements which, on their surface, are directly contrary to Ms. Gibb's pecuniary interest. Her statements *299 that she and petitioner both knew about corporate payments being made for their personal benefit are evidence that, if relied upon, could lead to a finding that Ms. Gibb (as well as petitioner) is liable for the deficiencies. Petitioner suggests, however, that to the extent he is found liable for the deficiencies, Ms. Gibb in effect will be absolved of liability. Petitioner's suggestion is based on his assertion that Ms. Gibb, since declaring bankruptcy, owns few, if any, assets in her name and has no more than moderate income on which respondent may levy to collect any redetermined deficiencies. Petitioner, on the other hand, is still a substantial shareholder in AWC and PRD and appears to have adequate assets to satisfy the deficiencies and additions to tax. Because the liability for Ms. Gibb and petitioner is joint and several (absent an innocent spouse finding), petitioner postulates that respondent would attempt to collect all amounts from him first, before focusing collection efforts on Ms. Gibb. Given the evidence at hand, we believe such a circumstance is quite plausible. Respondent would have us believe there is additional evidence, besides Ms. Gibb's testimony, of *300 petitioner's knowledge of the use of corporate funds for personal benefit. Respondent cites the fact that petitioner wrote a PRD check to Capitol Lighting to pay for fixtures at the Glen Gardner house. That check, however, is the only one signed by petitioner of the 143 asserted by respondent to represent taxable income. We think that if petitioner truly were involved in or aware of any scheme of siphoning corporate funds to his benefit, he either would have signed more than one such check during the two-year period in issue, or he would have been very careful to avoid signing any such checks at all. We instead accept petitioner's explanation that he wrote the check on the corporate checking account because (1) it enabled him to get a contractor's discount for the fixtures, and (2) Ms. Gibb had informed him that, on account of the other costs of building and closing on the Glen Gardner house, their personal finances were strapped just at the time. Petitioner's use of one corporate check is not sufficient evidence to show that petitioner had actual knowledge of Ms. Gibb's widespread writing of checks for personal benefit, [13] and we do not see any other evidence in the record to *301 convince us that petitioner was aware of the extent of Ms. Gibb's wholesale writing of corporate checks for personal purposes. In order to qualify as an innocent spouse, however, petitioner also must show that he had no reason to know about the omissions of gross income from the Barretts' tax returns. Petitioner testified that he presumed he and Ms. Gibb had adequate personal funds to purchase the household furnishings and other items acquired through the use of corporate checks. He was aware that the Barretts borrowed money from banks, at least five different loans providing in excess of $ 24,000 during 1975 and 1976, as well as used mortgages to finance the purchase of the Tewskbury lot and the Glen Gardner home. Petitioner also testified that he thought Ms. Gibb's family, besides making loans to *302 the Barretts, gave Ms. Gibb gifts of cash and other property, from time to time, which provided funds for the couple's purchases. Petitioner, however, as president of AWC and PRD, had some duty to be aware of the financial circumstances of the corporations. See Clevinger v. Commissioner,826 F.2d 1379, 1382 (4th Cir. 1987), affg. T.C. Memo. 1986-149; Quinn v. Commissioner,62 T.C. 223, 230-231 (1974), affd. 524 F.2d 617 (9th Cir. 1975). [14] Indeed, when funds from those corporations were used to pay for the down payments for the Tewksbury lot and the Glen Gardner house and to purchase items for the Barretts' new home, we do not think it reasonable if petitioner truly were not aware of such. Clevinger v. Commissioner,826 F.2d at 1382. Moreover, we think petitioner also significantly benefited from such payments. See Purcell v. Commissioner,86 T.C. at 242. Thus, to the extent that corporate checks were so used, we find that it is not inequitable to hold petitioner liable for deficiencies attributable to those omissions of gross income. We therefore hold that petitioner is not an innocent *303 spouse in regard to those checks, and we shall identify those checks in our discussion below of all other checks in issue. With regard to other payments, however, such as those to Frank Ogden and the Staggs, we do not believe petitioner reasonably should have known of such payments. Ms. Gibb's deliberate concealment of the actual uses of the corporate checks is a significant factor in support of an innocent spouse holding. [15] Ms. Gibb gave petitioner monthly accounts payable and cash flow schedules, by which petitioner thought he was able to monitor the corporations' financial status adequately. Even if petitioner had examined the underlying accounting journals, he likely might not have been made aware of the improper corporate payments because entries for many of the checks in issue were misstated or nonexistent. Short of doing an audit of the financial statements or some other in-depth analysis, we question that petitioner could have been able to ascertain the existence of the improper payments. Even Mr. Ojeda, the certified public accountant who prepared a certified balance sheet for one or both of the *304 corporations for purposes of a bank loan, professed not to have been aware of Ms. Gibb's use of corporate checks for personal purposes. [16]
*305 Further, petitioner was hampered in ascertaining the misuse of corporate funds by the lack of historical financial data about the relatively young corporations, especially PRD -- from which Ms. Gibb began writing checks for personal use during its first full year of operations. Therefore, we find that, at least for some checks, petitioner qualifies as an innocent spouse because (1) he did not know and had no reason to know of the omissions from his tax returns of the amounts of checks attributable to Ms. Gibb alone, and (2) it would be inequitable to hold him liable for the deficiencies attributable to the omissions of the checks. See Douglas v. Commissioner,86 T.C. 758, 761 n.3 (1986). [17]
(b) The Checks
Having decided that petitioner qualifies as an innocent spouse, at least with respect to certain of the checks at issue, we now turn to deciding which of the checks were used for the personal benefit of petitioner and/or Ms. Gibb, and for which of the checks petitioner qualifies as an innocent spouse. In that regard, *306 we shall speak in terms of "liability" for specific checks, and then later discuss the tax implications of such "liability." In deciding whether the corporate checks were used for personal benefit, we keep in mind who bears the burden of proof. See text accompanying n.11, supra.
Petitioner fails to show either that he received no significant benefit on account of the payments for VISA ($ 839.83) and American Express charges ($ 1,648.65) or that the charges were for corporate and not personal expenses, and we therefore find both him and Ms. Gibb liable for those amounts. With respect to the two checks paid on Ms. Gibb's Master Charge account, we find Ms. Gibb liable for both checks, but we find petitioner liable for only the one in the amount of $ 449.40 on which he bears, and fails to meet, the burden of proof. [18] Respondent has the burden of proof on the other Master Charge payment (to Heritage Bank in the amount of $ 210.81) and has failed to satisfy us that the check is not attributable solely to items for Ms. Gibb. We also find that the payment to Bloomingdale's ($ 450.15) was attributable only to Ms. Gibb, and we find her alone to be liable for it. *307 The payments to St. Barnabas Medical Center, Dr. Egge, The Peer Group, and Dr. O'Driscoll were solely for medical services rendered to Ms. Gibb ($ 2,031). Although the corporations provided the "up front" money for those medical services, we find that petitioner was unaware of the financial arrangements for paying for them. We accordingly find Ms. Gibb, but not petitioner, to be liable for those payments. Ordinary support of a spouse, such as the payment of medical expenses, does not constitute a significant benefit (within the meaning of section 6013(e)) to petitioner. See Mysse v. Commissioner,57 T.C. at 699. With respect to the $ 55 payment to Dr. Newmann, $ 36 is attributable to services for Ms. Gibb, and we find her alone to be liable for that amount. The record does not indicate for whom the remaining $ 19 was attributable, and we find both petitioner and Ms. Gibb jointly liable. The record also does not indicate who benefited from the $ 105 payment to Dr. Miller and, in accordance with their burden of proof, we find petitioner and Ms. Gibb jointly liable therefor. We find both of the Barretts to be jointly liable for the following payments used to *308 pay the down payments on real property owned jointly or to pay for goods and services for the Glen Gardner house: B & E Trust Account
$11,265.62
Capitol Lighting
808.55
Tom Westerlund
[19] 3,405.00
John Conway
4,249.60
FAD Co.
1,430.10
Eber's Furniture
397.95
Knoll Intl.
1,144.50
John Rudl & Sons
510.40
Pickering
[20] 900.63
Richard Koza
1,977.50
Ed Oathout
1,851.00
Respondent asserted in his amended answer that four checks written to *309 Mark Bromley were for gardening services at the Glen Gardner house and includable in the Barretts' taxable income. Respondent thus has the burden of proof on those checks. One of the checks paid to Mr. Bromley was written in October 1975, while the Barretts were living in an apartment and five months before the Barretts closed on the purchase of their house, and we find that check to constitute a corporate expense for which neither of the Barretts is taxable. Although Mr. Bromley was the gardener and landscaper for the corporate offices during 1975 and 1976, the parties also have stipulated that Ms. Gibb hired Mr. Bromley to perform gardening services at the Glen Gardner house. Therefore, weighing heavily against the party with the burden of proof (respondent), we find that Ms. Gibb and petitioner are jointly liable for $ 300 of the amounts paid to Mr. Bromley in 1976. See Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930); Hospital Corporation of America v. Commissioner,81 T.C. 520, 601-602 (1983). During 1976, petitioner was aware that Ms. Gibb was a part-time travel agent for Monarch Travel. The Barretts' 1976 tax return did not include any *310 income from Monarch Travel, even though Ms. Gibb received $ 349.57 in commission checks during the year. We find that petitioner had reason to know that Ms. Gibb received commission income from Monarch Travel, and any failure to inquire of her as to why no income from Monarch Travel was reported on the tax return is not reasonable. We therefore find that petitioner is not an innocent spouse as to Ms. Gibb's Monarch Travel commission income and that both he and Ms. Gibb are jointly liable for that $ 350 of income in 1976. We turn next to the eight AWC and PRD checks written to Monarch Travel ($ 3,185.31) that respondent determined to be taxable income to the Barretts. Petitioner has the burden of proof. Petitioner asserts that the payments to Monarch Travel were made as a way for Ms. Gibb to accumulate a private savings fund by making inflated payments on corporate bills to Monarch Travel. Petitioner testified that he learned about Ms. Gibb's use of Monarch Travel "as a savings bank" after speaking with the travel agency's owner. Respondent, citing only Ms. Gibb's testimony as evidence, asserts that the checks to Monarch Travel paid for personal vacations of the Barrett family. *311 The issuance of a Monarch Travel check to PRD in late 1977, after Ms. Gibb had inquired about having the money sent to her, supports petitioner's assertion that Ms. Gibb was using Monarch Travel as a means to siphon funds out of AWC and PRD. [21] Petitioner's position is also supported by his testimony, which we feel is plausible, that during the years in issue he took only two vacations -- one in 1975 to St. Maarten and one in 1976 to Hawaii, both of which were paid for personally. We are hindered in our consideration of the checks to Monarch Travel by the absence of any receipts or account statements to show the purposes to which the agency applied the payments. The absence of such documentation, however, tends to support petitioner, rather than respondent, because we believe that if the funds were used to pay for personal vacations, there would be some documentary evidence, from either Monarch Travel or the service providers, of the travel or hotel accommodations to which the payments were applied. The lack of any such documentation supports petitioner's contentions that the checks were used by Ms. Gibb to provide a private fund for herself. Accordingly, we find petitioner *312 to be an innocent spouse with regard to the checks paid to Monarch Travel. We also find Ms. Gibb liable for those same amounts because she fails in her burden to show that those amounts did not accrue to her personal benefit. [22]
Respondent has the burden of proof regarding checks written to Allen Tiger. Ms. Gibb testified that Susan Tiger *313 was a housekeeper who generally cleaned the Barrett's house one a week or so, but who, in late 1976, stayed at their house throughout the working week so as to tend to Ms. Gibb's terminally-ill great uncle, Mr. Wiley. The CID report on Ms. Gibb supports that testimony in that it refers to an affidavit of Susan Tiger in which she stated she was "paid for cleaning services" at the Glen Gardner house. Ms. Gibb managed Mr. Wiley's financial affairs while he lived with the Barretts and later served as Mr. Wiley's executor, and petitioner testified that he thought the funds paying for Susan Tiger's care of Mr. Wiley were coming from Mr. Wiley's estate. We find that Susan Tiger performed housekeeping services at the Glen Garner home and that petitioner significantly benefited from Mrs. Tiger's services of caring for Mr. Wiley. We find that petitioner is liable for only $ 440 of the payments made to Allen Tiger and is an innocent spouse with respect to the remaining $ 440, but that Ms. Gibb is liable for the entire amount of $ 880 asserted by respondent in his amended answer. In November and December 1976, corporate checks were written to Harrington's, Inc. and Reuben H. Donnelley Corporation *314 to purchase liquor and an Official Airline Guide, respectively. Petitioner has the burden of proof, and the only evidence in the record to support exclusion of these amounts from the Barretts' individual income is Ms. Gibb's testimony that some of the items purchased from Harrington's, Inc. were used for business and not personal purposes. We find that naked assertion to be inadequate to carry the burden of proof and find Ms. Gibb and petitioner jointly liable for the full amounts of the checks paid to Harrington's, Inc. and Reuben H. Donnelley Corporation. With respect to checks written to Jack's Auto Repair, David Stagg, and Frank Ogden for repairs to Ms. Gibb's MG, we find that petitioner is an innocent spouse. [23] Even though petitioner was awarded the MG as part of the property settlement, he never took possession of the car and never used it because of its state of disrepair when he finally located it in the storage lot. Ms. Gibb, however, used the car during the marriage, and we find her liable for the payments. With regard to the payment to Peter Zartin for painting Ms. Gibb's Oldsmobile, respondent has the burden of proof and has not shown that petitioner significantly *315 benefited or that petitioner had reason to know of such a payment. We therefore find petitioner is an innocent spouse and is not liable for the payment to Mr. Zartin. We do, however, find Ms. Gibb liable for that payment. Petitioner asserts that the $ 130 check paid in 1975 to Joseph Seidel, Esq. was payment for Mr. Seidel's representation of Frank Ogden in a criminal manner. Respondent, on the other hand, asserts on brief that the check was used to pay for Mr. Seidel's rendering divorce law consultation to Ms. Gibb, but the record contains no evidence to support respondent's assertion. In either event, the check benefited Ms. Gibb, but not petitioner, and we find only Ms. Gibb to be liable for that payment. With regard to the checks paid to the Staggs, Carol Tick, Executive Secretary, and Cash (endorsed by Carol Tick), we find *316 that petitioner is an innocent spouse because he received no significant benefit and had no reason to know about those payments. Ms. Gibb's misrecordation in the cash journals of the payees of certain of those checks, as well as her removal of many, if not all, of those checks from the monthly bank statements would have thwarted petitioner's discovery of the actual use of the funds. We find, however, that Ms. Gibb is liable for the amounts asserted by respondent as paid to those payees. [24]
Petitioner and Ms. Gibb have the burden of proof on checks paid to American National Bank, Bottle King, M & M, Morrell & Co., Town and Country Liquors, C. Dyda, Bill Franzel, and Richard Luster. The record contains no evidence *317 with regard to these payments, and we find that petitioner and Ms. Gibb fail to meet their burden of proof. They therefore are jointly liable for these payments. With regard to checks written to Randy Krogell and Curry Leisure Time Sales, respondent did not object to petitioner's requested findings of fact that these payments were for legitimate business expenses of AWC. Ms. Gibb's testimony supports petitioner's requested findings, and we deem respondent to have conceded that those payments were for legitimate corporate expenses and do not constitute taxable income to either petitioner or Ms. Gibb. (c) Theory of Taxation
Having decided that petitioner is an innocent spouse as to certain checks and "liable" for certain others, we now turn to the taxation of those amounts. Respondent and petitioner both discuss the issue in terms of the corporate payments being taxed as a constructive dividend. We do not think that a constructive dividend analysis is appropriate with respect to corporate payments effected by Ms. Gibb that were without the knowledge or approval of petitioner or any other shareholder and that did not benefit petitioner or any other shareholder. There is no *318 question but that Ms. Gibb is properly taxable on corporate payments from which she, as a non-stockholder, benefited. Insofar as such payments are concerned, we hold that they are taxable to Ms. Gibb as embezzlement [25] income ( James v. United States,366 U.S. 213 (1961)), and that, as noted above, petitioner qualifies as an innocent spouse and is relieved of his joint and several liability for the deficiencies attributable to those payments.
As for the taxability of checks on which we find petitioner not to be an innocent spouse, a constructive dividend analysis is the appropriate theory to apply. [26] See Truesdell v. Commissioner,89 T.C. 1280 (1987). Under the constructive divided theory, a shareholder is taxed on funds received by him or used for his benefit: first, as ordinary income to the extent of the current and accumulated earnings and profits of the corporation; and second, for amounts received in excess of earnings and profits, as a nontaxable return of capital to the extent of the shareholder's basis in the stock. Truesdell v. Commissioner,89 T.C. at 1294-1295; *319 secs. 301, 316(a).[27] We take petitioner to have conceded that there were sufficient earnings and profits ("E & P") to support dividend treatment for all AWC payments through April 30, 1976, and all PRD payments through September 30, 1976. We accordingly hold that all checks written on or before those dates for which we found petitioner liable are taxable to him as ordinary dividend income. *320 Petitioner argues, however, that (1) losses were realized by AWC for fiscal year ending ("FYE") April 30, 1977, and by PRD for FYE September 30, 1977 (the "corporations' 1977 FYEs"); (2) neither corporation had current or accumulated E & P in its respective 1977 FYE after taking into account its loss (i.e., negative E&P); and (3) the checks written during the corporations' 1977 FYEs therefore are non-taxable returns of capital under section 301(c)(2) and not taxable dividends under sections 301(c)(1) and 316(a). Petitioner asserts that the losses for the corporations' 1977 FYEs far exceeded any accumulated E & P from prior fiscal years, so that all constructive distributions in the corporations' 1977 FYEs constituted nontaxable returns of capital. Respondent's only responses to this argument are (1) a statement that accumulated E & P from prior fiscal years exceeded the losses for the corporations' 1977 FYEs and (2) a general assertion that petitioner has not proved respondent's determination to be incorrect. We note first that even though we found petitioner "liable" for certain amounts, such a finding does not satisfy respondent's burden of proof on the checks asserted first *321 in his amended answer. Contrary to respondent's intimations, he still bears the burden to prove that those checks first asserted in his amended answer constitute a taxable dividend, rather than a nontaxable return of capital. Truesdell v. Commissioner,89 T.C. at 1296; Rule 142(a). The corporations' E & P must be ascertained to decide whether the checks for which we found petitioner "liable" constitute taxable dividend income to him in 1976. In that regard, the parties fail to discuss adequately the interplay between beginning-of-the-year accumulated E & P and a current-year deficit in E & P. The issue is contemplated in section 1.316-2(b), [28] Income Tax Regs., however, and we read the regulation to provide that in determining a corporation's E & P with respect to a specific distribution, a current-year E & P deficit must be allocated against the beginning-of-the-year accumulated E & P. We further read that regulation to provide that if a current year-to-date E & P deficit cannot be determined as of the date of a distribution, the entire-year E & P deficit is to be prorated to that portion of the year ending on the day preceding the day of the distribution. *322 See sec. 1.316-2(c), Income Tax Regs. See also Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders, par. 7.03, p. 7-9, Example 4 (5th ed. 1987); Rev. Rul. 74-164, 1974-1 C.B. 74, for sample calculations of E & P in accordance with our interpretation. The parties have not provided adequate evidence to calculate the current E & P deficit at the date of any check, so we hold that the E & P deficits for the corporations' 1977 FYEs must be prorated throughout the year. *323 In evidence, without petitioner's objection, are three sets of E & P calculations for AWC and PRD which were prepared at different times by the revenue agent who performed the civil tax audits of the Barretts and the corporations. Petitioner does not offer alternative E & P computations. The three sets of E & P calculations each present an amount of beginning accumulated E & P for the corporations' 1977 FYEs in the following ranges: Year Beginning
Range
AWC
5/1/76
$38,285 - 43,101
PRD
10/1/76
67,135 - 71,892
Given petitioner's failure to present contradictory evidence, we find the accumulated E & P at the beginning of the corporations' 1977 FYEs to be within those ranges. We above found petitioner to be "liable," i.e., taxable to the extent provided by section 301(c), in his 1976 taxable year for PRD checks written after September 30, 1976, in the approximate amount of $ 3,000, and for AWC checks written after April 30, 1976, in the approximate amount of $ 8,000. The only indication in the record of PRD's E & P deficit for its 1977 FYE is its income tax return, which reflects a net loss for that year of $ 65,180. Thus, given PRD's beginning-of-the-year *324 accumulated E & P of at least $ 67,135, the prorata E & P deficit for the three months of October-December 1976 would not be sufficient to eliminate PRD's accumulated E & P. We therefore find that all PRD checks for which petitioner is liable are taxable to him as ordinary dividend income. AWC's accumulated E & P, which was approximately $ 40,000 at May 1, 1976, would have reached zero at some time between late September and the end of November 1976, given AWC's 1977 FYE taxable loss of between $ 82,000 and $ 93,000. [29] Thus, we find that any checks written after the date at which AWC's beginning accumulated E & P was depleted (by downward adjustments for constructive dividends to petitioner and for prorated current-year negative E & P) constitute a return of capital, [30] and not ordinary dividend income. We instruct the parties to make, in the Rule 155 computation which we will order, the appropriate E & P prorations for the date of each AWC check so as to determine the amounts of those checks attributable to dividend income. *325 (d) Bonus
One last item. Petitioner argues that he should not be liable for a $ 10,000 amount included in the original 1976 joint return as salary income, even though petitioner received a Form W-2 for that amount from PRD. Petitioner contends that although he was due a bonus during 1976 in the amount of $ 10,000, as represented by the W-2, no check ever was issued by PRD to pay for the bonus. Petitioner asserts that the bonus was to be paid soon before the closing on the Glen Gardner house, while Ms. Gibb was handling all family finances through her separate checking account, and that he at the time presumed that Ms. Gibb used the amount of the bonus to pay for costs related to closing on the house. We find that petitioner has failed to meet his burden to prove that the $ 10,000 is not properly includable, in addition to the checks discussed above, in his and Ms. Gibb's 1976 taxable income. Indeed, we note that an entry was made in PRD's general ledger to record the $ 10,000 as a charge to direct wages during PRD's year ending September 30, 1976. We also note that the record does not contain 1976 bank statements of PRD, Ms. Gibb's separate checking account, or the Barretts' *326 joint checking account. Given the issuance of a W-2 Form for $ 10,000 and the like entry in the general ledger, we decline to exclude the amount from petitioner's income without some documentary evidence to contradict the Form W-2, such as bank statements from that period clearly showing either that no such amount was ever paid by PRD or that no such amount ever was received by petitioner or Ms. Gibb. In that no such evidence has been presented, we hold that petitioner may not exclude the $ 10,000 from his 1976 taxable income. 3. Fraud Additions
We turn last to petitioner's liability for the addition to tax for fraud under section 6653(b). Respondent bears the burden of proving, by clear and convincing evidence, that some part of the underpayment for each year is attributable to fraud. Katz v. Commissioner,90 T.C. 1130, 1143 (1988); Rule 142(b). To meet his burden, respondent must show that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Rowlee v. Commissioner,80 TC. 1111, 1123 (1983). *327 The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud never will be presumed, Beaver v. Commissioner,55 T.C. 85, 92 (1970); however, it may be proved by circumstantial evidence because direct proof of a taxpayer's intent rarely is available. Rowlee v. Commissioner, 80 T.C. at 1123; Gajewski v. Commissioner,67 T.C. at 200. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner,56 T.C. 213, 224 (1971); Otuski v. Commissioner,53 T.C. 96, 106 (1969). A pattern of consistent underreporting of income is indicative of fraud. Foster v. Commissioner,391 F.2d 727, 733 (4th Cir. 1968), affg. on this issue a Memorandum Opinion of this Court. Fraud is also indicated by a plan to convert corporate earnings to a taxpayer's personal use under the guise of corporate expenses. Meyers v. Commissioner,21 T.C. 331, 348-349 (1953). *328 [31] The mere failure to report income, however, is not sufficient to establish fraud. Merritt v. Commissioner,301 F.2d 484, 487 (5th Cir. 1962); Sunbrock v. Commissioner,48 T.C. 55, 64-65 (1967). Fraud may not be found under "circumstances which at most create only suspicion." Davis v. Commissioner,184 F.2d 86, 87 (10th Cir. 1950); Katz v. Commissioner,90 T.C. at 1144. Fraud is not imputed from one spouse to the other; in the case of a joint return, respondent must prove fraud as to each spouse charged with the addition to tax. Sec. 6653(b) (last sentence) (now in effect as sec. 6653(b)(3)); Stone v. Commissioner,56 T.C. at 227-228. While we found above that petitioner was liable for deficiencies attributable to certain corporate checks used to benefit him and Ms. Gibb because petitioner was not an innocent spouse, such a finding does not mean that petitioner necessarily had actual knowledge of the writing of those checks. Relying on Ms. Gibb's testimony, respondent suggests that petitioner's father, Emmett Barrett, laid *329 out the blueprint for the diversion of corporate funds for the Barretts' personal benefit and taught Ms. Gibb how to siphon funds out of the corporations. Respondent portrays Ms. Gibb as someone whose "acts were not her own but those of the puppeteers who pulled her strings: Emmett and Timothy Barrett." Respondent asserts that "Emmett and Timothy Barrett had an insatiable need to evade taxes," and that Ms. Gibb was merely their "instrument of insidiousness." Respondent describes petitioner as "the ultimate authority over corporate life" who "as husband in the marital home was more than the potted plant he is made out to be" and who "is hardly the distracted drummer he is portrayed as." Respondent states that "petitioner is so deeply buried in fraud that it would take an archeological dig to uncover him" and that petitioner has succeeded only in "revealing himself as the ethical eunuch that he is." Notwithstanding the flowery and inflated rhetoric in respondent's brief, his case is grounded almost entirely upon the credulousness of Ms. Gibb's testimony and the incredulousness of testimony from petitioner and other witnesses, whom respondent characterizes as "the 'rogues gallery' *330 of witnesses petitioner presented [who] were chaplinesque in demeanor and bankrupt of veracity." Unfortunately for respondent, however, the star to which he has hitched his wagon, [32] Ms. Gibb, possesses but a mere glimmer of vanishing veracity herself, and, as noted above, we are decidedly disinclined to give any weight to her testimony without independent corroboration. As for respondent's assertions about witnesses being "bankrupt in veracity," he apparently is referring to Carol Tick and several former AWC/PRD employees, all of whose testimony indicated that Ms. Gibb made concerted efforts to prevent petitioner from discovering her check-writing machinations. Except for Ms. Tick and Mrs. Stagg, both of whom cooperated with Ms. Gibb by returning funds to her after cashing corporate checks written to them, we see nothing to indicate that the former employees were biased or had any incentive not to be forthright in their testimony. Even Ms. Tick and Mrs. Stagg, who might not have wanted to admit their association with the schemes for siphoning funds out of AWC and PRD, testified credibly to parts in such schemes, *331 and, we find their testimony to be truthful. The only nonparty witness whose veracity we question is Mr. Ojeda, who possibly was aware of the use of corporate funds for personal purposes (see n.16, supra ), but respondent does not question Mr. Ojeda's testimony that he was never aware of the diversions of corporate funds for the Barretts' personal benefit. Without Ms. Gibb's testimony to carry his burden, respondent must resort to circumstantial evidence. Indeed, given the facts at hand, namely, checks from two closely-held family corporations, in which both husband and wife were active in operations and management, purchasing goods and services for personal purposes of the husband and wife, an initial reaction at first blush would be that both husband and wife must be aware of such uses of corporate funds and their failure to report such funds on their individual tax return is indicative of fraudulent intent. Upon closer examination, however, Ms. Gibb's falsification of the corporate records and concealment of cancelled checks causes us to find that petitioner was unaware that corporate checks went to certain payees and to question whether he actually knew of Ms. Gibb's writing *332 of corporate checks to pay for other items, like the furnishings and downpayment for the Glen Gardner house. We, unlike respondent, think it possible that petitioner "was like Nero, that he fiddled while [PRD] and [AWC] burned." Respondent suggests that because petitioner arranged the purchase of household furniture and fixtures from John Conway and Capitol Lighting, respectively, he must have been aware that corporate checks were used to pay for those purchases. We do not think the record contains sufficient evidence to support that hypothesis. First, the check paid to John Conway is listed in the disbursements journal as being paid to a major PRD supplier, not to John Conway. We cannot imagine why such a check would be misrecorded in the disbursements journal, except to prevent petitioner from learning of such a use of corporate funds if he reviewed the journal. The only PRD shareholders were petitioner and his father, and if respondent's scenario were correct, Emmett Barrett was the mastermind behind the siphoning scheme. Under respondent's scenario, petitioner would have no reason to hide the true payee of the check in such a manner, because the only other PRD shareholder *333 already would be aware of the use of PRD funds for personal purposes. With respect to the Capitol Lighting payment, it is obvious that petitioner knew of the payment because he signed the check. Petitioner testified, however, that he had discussed with Ms. Gibb deducting that check from the amount of the $ 10,000 PRD bonus due him, which he reported on the 1976 tax return, and that he saw nothing wrong with using a corporate check in such fashion. Petitioner's explanation is plausible, and if true, represents a reasonable tax treatment of the payment. That petitioner now also argues against taxation of the bonus, on the grounds that he never received the rest of the cash due him, does not vitiate his asserted understanding during 1976 that the Capitol Lighting check had been included in his reported 1976 taxable income via inclusion of the bonus. Although we may not be sure that petitioner's explanation of the events is accurate, it is not his burden to prove such; respondent has the burden of proof on the fraud issue, and we are far from convinced that petitioner's explanation is inaccurate or that he knowingly failed to include the Capitol Lighting check in his 1976 taxable *334 income. As evidence of petitioner's fraud, respondent also points to eight PRD payroll checks written in November and December 1975 to petitioner's sister, Robin Barrett. Respondent asserts that "instead of funding Robin Barrett in a legitimate fashion with his taxed personal funds, petitioner had his sister on the payroll in a 'no-show' job." Petitioner testified that Robin Barrett was not a shareholder or an employee in the corporation at the time, but he was unsure as to whether she was a student at the time the checks were written. Respondent, however, failed to ask petitioner whether he had any knowledge of Ms. Gibb's writing of payroll checks to Robin Barrett. Although we might assume that petitioner had such knowledge, Ms. Gibb's method of operations leave at least some question in our mind whether petitioner actually knew of the checks going to Robin Barrett. We also are puzzled by respondent's failure to include the amounts of the checks to Robin Barrett as unreported income to the Barretts -- if the payments to Robin Barrett were merely gifts, the appropriate tax treatment would be a corporate distribution to petitioner with a corresponding gift to his sister. In any *335 event, we are not satisfied that the payment of checks by PRD to Robin Barrett is necessarily indicative of petitioner's fraudulent intent. We are not convinced that petitioner was ignorant of Ms. Gibb's writing of corporate checks for at least some personal expenses; indeed, we suspect that he might have been aware of such, especially in light of the many persons of questionable virtue associated with AWC/PRD. [33] Fraud additions, however, are not to be sustained based merely upon suspicion or on isolated items in the record. Katz v. Commissioner,90 T.C. at 1144; Marinzulich v. Commissioner,31 T.C. 487, 490 (1958) (quoting Kellett v. Commissioner,5 T.C. 608, 616 (1945)). Fraud must be proved by clear and convincing evidence, on the basis of the whole record. Malinzulich v. Commissioner,31 T.C. at 490. Ms. Gibb deliberately withheld certain information from petitioner regarding her use of at least some corporate checks, and we think it quite possible that she was out "to take [petitioner] for everything she could" (as she supposedly told at least one AWC employee), including bleeding his family corporations *336 for funds to purchase items for her personal use (even though petitioner also may have coincidentally benefited from some of the purchases). We are not willing on the record before us to extrapolate petitioner's poor judgment in not paying closer attention to Ms. Gibb's handling of corporate or personal funds to a finding of intent to defraud the Government by calculated tax evasion. See Marinzulich v. Commissioner,31 T.C. at 491-492 (quoting Iley v. Commissioner,19 T.C. 631, 635 (1952)). We accordingly find that respondent has not met his burden of clearly and convincingly proving fraud by petitioner for 1975 and 1976, and we hold that petitioner is not liable for the addition to tax under section 6653(b) for those years. Decisions will be entered under Rule 155.
APPENDIX I Payee
Number of checks
Amount
Heritage Bank/Master Charge
2
$    660.21
BT Credit Co. (VISA card)
2
839.83
American Express
3
1,648.65
Bloomingdale's
1
450.15
The Peer Group (Robby Meijer, M.D.)
1
1,225.00
Robert Egge, M.D.
1
200.00
St. Barnabas Medical Center
1
256.00
Thomas Newmann, D.D.S.
1
55.00
Robert O'Driscoll, M.D.
1
350.00
Philip Miller, M.D.
1
105.00
Joseph S. Seidel, Esquire
1
130.00
American National Bank
4
3,259.70
Beldon & Eberhardt Trust Account
2
11,265.62
Bottle King
2
285.60
Capitol Lighting
1
808.55
Curry Leisure Time Sales
1
230.00
Eber's Furniture
1
397.95
FAD Co.
1
1,430.10
Harrington's, Inc.
2
189.05
Jack's Auto Repair
1
294.30
John Rudl & Sons
2
510.40
Knoll International
1
1,144.50
M & M
1
51.53
Monarch Travel
8
3,185.31
Morrell & Co.
1
212.56
Pickering Lumber and Supply Company
4
1,395.21
Reuben H. Donnelley Corporation
1
142.72
Town & Country Liquors
1
277.95
Executive Secretary
2
455.00
Cash (endorsed by Carol Tick)
2
650.00
Carol Tick
4
2,164.80
Mark Bromley
4
1,253.75
John Conway
1
4,249.60
C. Dyda
1
140.00
Bill Frazel
1
385.00
Richard Koza
8
1,977.50
Randolph Krogoll
2
1,340.00
Richard Luster
1
90.00
Ed Oathout
8
1,851.00
Frank Ogden
14
4,871.53
David Stagg
3
619.00
Linda Padden (Stagg)
2
1,000.00
Philip Stagg
31
15,500.00
Alan Tiger
5
880.00
Tom Westerlund
4
3,405.00
Peter Zartin
1
450.00
143
72,283.07
*337 Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and applicable to the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. During the 73 weeks of August 1975 through December 1976, only six payroll checks were issued in petitioner's name.↩
3. Respondent's amended answer asserted that the Barretts' unreported taxable income attributable to these checks is only $ 880. The $ 20 difference is attributable to respondent's inclusion in the Barretts' taxable income of only $ 100 out of a $ 120 check to Mr. Tiger. In addition, at least one corporate check paid to Allen Tiger in 1976 was not asserted by respondent as constituting unreported income to the Barretts. The record does not indicate why the total amount paid to Allen Tiger was not asserted as includable in the Barretts' taxable income.↩
4. The total income reflected on the four Forms 1099 is $ 16,000. The difference between the $ 16,000 reported on the Forms 1099 and the actual sum of the checks written to the Staggs, $ 16,500, is unexplained.↩
*. The words "Wm Temple" were crossed out, and "VOID" was written beside them.↩
5. From his secretary's description of this incident to Mr. Ojeda, he understood petitioner to have "forcibly removed" the records from the office.↩
6. Soon after Ms. Gibb was expelled from the corporate headquarters, she asked Linda Plice, an employee hired as a secretary/receptionist/mail clerk to replace Mrs. Stagg, to remove from the corporate offices a suitcase containing what Mrs. Plice understood to be records. Mrs. Plice, being a recently-hired employee, declined to "get involved" and help Ms. Gibb. Ms. Gibb testified that the suitcase she asked Mrs. Plice to remove contained "Tim's pornography collection," not business records.↩
7. For a year later than those in issue, petitioner took a bad debt deduction on his income tax return for the diminished value of the MG.↩
8. Presumably, the conspiracy count was conspiracy to commit Medicaid fraud, but the opinion of the Supreme Court of New Jersey does not specify the exact conspiracy charge.↩
9. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. * * * (c) Exception. -- (1) False Return.-- In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.↩
10. Because we find fraud, we need not consider whether the 6-year period of limitations for a substantial omission from gross income under section 6501(e) also might permit assessment of petitioner. We note also that our finding that the return was filed fraudulently for purposes of section 6501(c)(1) is not a finding that petitioner individually is liable for the section 6653(b) addition to tax for fraud. See sec. 6653(b), as in effect in 1975 and 1976 (and now embodied in sec. 6653(b)(3)). We discuss below petitioner's liability for the fraud addition.↩
11. See also Emmer v. Commissioner,T.C. Memo. 1978-102↩.
12. See Bell v. Commissioner,T.C. Memo. 1989-107; Smith v. Commissioner,T.C. Memo. 1987-226↩, n.8.
13. Respondent also asserts that petitioner committed fraud in obtaining the contractor's discount on the Capitol Lighting purchase by leading that vendor to believe that PRD, not petitioner individually, was the purchaser of the fixtures. Respondent implies that such action is evidence of petitioner's overall fraudulent behavior, but we decline to draw any such inference.↩
14. Dickey v. Commissioner,T.C. Memo. 1985-478↩.
15. See Sheckles v. Commissioner,T.C. Memo. 1984-289↩. 16. Respondent makes no objection to two of petitioner's requested findings of fact (paragraphs 35 and 123) that contain statements about Mr. Ojeda not being aware of any irregularities, such as use of corporate funds for personal purposes, in Ms. Gibb's accounting practices. We find it hard to believe, though, that an adequate↩ financial statement audit could be performed without the auditor's discovering Ms. Gibb's misuse of corporate funds, especially if, as was the case with Mr. Ojeda, the auditor were under criminal indictment for fraudulent preparation of other financial statements in which business funds were used for personal uses of the owners. Even if Mr. Ojeda were aware of Ms. Gibb's misuse of corporate funds, however, we are uncertain that he would have informed petitioner. Indeed, there are indications in the record that Mr. Ojeda and Ms. Gibb may have arranged without petitioner's knowledge, to use corporate funds to pay approximately $ 1,700 for a country club membership for Ms. Gibb by means of Mr. Ojeda's firm billing AWC. (Review of AWC's purchases journal supports such a fact: in both 1975 and 1976, AWC received five bills ranging in amount from $ 150 to $ 600 from Mr. Ojeda's firm at approximately comparable times and amounts each year, and in the total amounts of $ 1,385 and $ 1,900 in 1975 and 1976, respectively; in 1975, however, there also was a sixth bill from Mr. Ojeda's firm in the amount of $ 1,750.)
17. See also Bell v. Commissioner,T.C. Memo. 1989-107; Jenkins v. Commissioner,T.C. Memo. 1988-326↩.
18. If petitioner had put into evidence adequate legible copies of the appropriate credit card billings, we might have been able to find in his favor regarding the VISA, American Express, or Master Charge payments.↩
19. Respondent's amended answer incorrectly includes one of the checks paid to Tom Westerlund (in the amount of $ 1,500) in the 1975 tax year, when the check in fact was written in March 1976. The parties are instructed to reflect the proper year of inclusion in the Rule 155 computation. ↩
20. We have included only the two Pickering checks on which the Barretts have the burden of proof. Respondent has the burden of proof for the other two checks, and he has failed to show that those checks were used other than to purchase lumber used in the normal cause of business of AWC or PRD. Accordingly, neither petitioner nor Ms. Gibb is liable for those two checks on which respondent has not met his burden of proof.↩
21. Ms. Gibb testified that the cost of petitioner's cancelled vacation to Tahiti in May 1977 had been paid for by one of the corporations, and that the refund from the cancellation of that trip would have been approximately "$ 1,500 - 1,800, something like that." As we noted above, however, we discount Ms. Gibb's testimony as being little more than the opportunistic statements of an intensely biased witness. ↩
22. Although Monarch Travel returned the $ 1,887.65 overage in the corporate account to PRD in late 1977, we do not think such an occurrence necessarily implies that Ms. Gibb did not receive a personal benefit from the checks she wrote in 1975 and 1976. Ms. Gibb continued to write corporate checks to Monarch Travel during 1977, and the repayment to PRD could be merely a repayment of checks written to Monarch Travel during 1977.↩
23. To the extent payments to Frank Ogden might have been for purposes other than repair of Ms. Gibb's car, we find Ms. Gibb still is liable because she has failed to show that she did not benefit from them. Petitioner, however, is still an innocent spouse in that we are certain he received no benefit from any payments to his wife's paramour.↩
24. Even though the record indicates that the Staggs retained part of the funds from the checks paid to them, Ms. Gibb's control of the funds results in the amount of all checks written to the Staggs being properly taxable to her under the rule of Bailey v. Commissioner,52 T.C. 115, 118-119 (1969), affd. per curiam 420 F.2d 777 (5th Cir. 1969). Accord Geiger's Estate v. Commissioner,352 F.2d 221, 231-232↩ (8th Cir. 1965).
25. At trial Ms. Gibb admitted that she had embezzled money from the corporations.↩
26. Respondent has not advanced any other theory, such as additional salary, illicit bonus, or commissions, under which petitioner should be taxed on the checks. ↩
27. The instant case is appealable to the Third Circuit, which, insofar as we can tell, has not adopted the rule used by the Sixth Circuit that any diversion of corporate funds by a shareholder results in ordinary income to the shareholder, without regard to the corporation's earnings and profits. See Weir v. Commissioner,283 F.2d 675, 684 (6th Cir. 1960); Davis v. Commissioner,226 F.2d 331 (6th Cir. 1955). In Truesdell v. Commissioner,89 T.C. 1280, 1298-1300↩ (1987), we discussed the Sixth Circuit's rule, rejected it for cases not appealable to the Sixth Circuit, and instead adopted the constructive dividend theory.
28. Sec. 1.316-2(b), Income Tax Regs., provides: The portion of each [distribution made during the taxable year] which is not regarded as out of earnings and profits of the taxable year shall be considered a taxable dividend to the extent of the earnings and profits accumulated since February 28, 1913, and available on the date of the distribution. In any case in which it is necessary to determine the amount of earnings and profits accumulated since February 28, 1913, and the actual earnings and profits to the date of a distribution within any taxable year * * * cannot be shown, the earnings and profits for the year * * * in which the distribution was made shall be prorated to the date of the distribution not counting the date on which the distribution was made.↩
29. AWC's tax return reported a loss of $ 92,088 for its 1977 FYE. One of respondent's E & P computations for AWC reflected a "corrected" loss for that fiscal year of $ 82,776 and an additional "embezzlement loss" of $ 9,312. We have equated the corporations' net losses for tax purposes with their deficits in current-year E & P, simply because the E & P calculations in evidence did so. A corporation's current year E & P, however, is not necessarily equal to its annual net income or loss. See, e.g., sec. 312(k), as in effect during the years in issue; sec. 312(n), as in effect for years beginning after September 30, 1984. ↩
30. Respondent has not suggested that petitioner's basis in his AWC stock is so low as to cause any checks to be taxable as amounts in excess of basis under section 301(c)(3). Further, we are satisfied by the evidence in the record that petitioner's capital contribution upon AWC's formation was in the form of cash, and that petitioner's basis in his AWC stock as of May 1, 1976, was in excess of the amounts of the post-5/1/76 AWC checks for which we find him liable.↩
31. Sly v. Commissioner,T.C. Memo. 1988-443↩.
32. See R. W. Emerson, Society and Solitude: Civilization.↩
33. Mr. Ojeda, the Staggs, Ms. Tick, and Mr. Smith come to mind in this regard.↩